IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SHARI L. REBROOK,**
**Plaintiff,**

**v.**

Civil Action No. 1:09CV50
(Judge Keeley)

**MICHAEL J. ASTRUE, COMMISSIONER OF**
**SOCIAL SECURITY,**
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Shari L. Rebrook ("Plaintiff") filed an application for DIB on August 30, 2004, alleging disability as of August 30, 2003, due to seizures, the residual effects of seizures, and depression and anxiety (R. 58-62). The Social Security Administration denied Plaintiff's claim at the initial and reconsideration levels (R. 40-51). Plaintiff requested further review, and Administrative Law Judge ("ALJ") Donald McDougal held an administrative hearing, after which the ALJ issued a decision dated June 26, 2006, finding Plaintiff not disabled within the meaning of the Act (R. 19-28). The Appeals Council denied Plaintiff's Request for Review on making the ALJ's decision the final decision of the Commissioner.

Plaintiff filed a Complaint with this Court.  See Case No. 5:07cv39.  On November 19, 2007, United States Magistrate Judge James E. Seibert entered a Report and Recommendation recommending the claim be remanded to the agency for further proceedings.  No objections to the Report and Recommendation were filed.  On March 26, 2008,  United States District Judge Frederick P. Stamp entered an Order adopting Magistrate Judge Seibert's opinion and remanding the decision to the Commissioner for further proceedings (R. 453-463).  Meanwhile, on August 16, 2006, Plaintiff had filed another application for benefits, again alleging disability since August 30, 2003.  The agency again denied Plaintiff's application initially and upon reconsideration.  Upon remand by the Court of the first application, the Appeals Council entered a remand order consolidating both of Plaintiff's claims for DIB (R. 465-468).  Subsequently, Plaintiff, represented by counsel, appeared for a second administrative hearing on November 7, 2008, again before ALJ Donald McDougal (R. 354-410).  Vocational Expert ("VE") Lawrence Ostrowski, Ph.D., also testified.

ALJ McDougal issued a decision on December 30, 2008, finding that Plaintiff was not disabled under the Social Security Act (R. 332-349).  Plaintiff timely filed her second Complaint in this Court.

## II. The Prior Court Decision and Newly-Submitted Evidence

Plaintiff was 37 years old on her alleged onset date,  39 years old on the date of the first administrative hearing,  and 42 on the date of the second administrative hearing.  She has a high school education and completed cosmetology school, and has prior work experience as a hair stylist. Neither party objected to the facts as recited by Magistrate Judge Seibert in his Report and Recommendation or any of his findings.  Those facts are therefore undisputed, and are set forth here

verbatim, with the exception of evidence submitted since the last claim was decided, which is included afterward.

## United Hospital Center, 3/23/04, (Tr. 260)
Impression: Unremarkable computed tomography head.

## Dr. Navada, M.D., 5/3/04 (Tr. 151)
Neurology: Mental status: She was alert and oriented in all spheres. Attention, concentration, language function, fund of knowledge and memory were normal.
Impressions: 1) Spells. 2) Seizures. 3) Depression.
Discussion:
1) Shari's neurologic exam is essentially normal. The spell she had in 1999 is suggestive of a seizure, although initially it may have been triggered by some degree of orthostatis. She, however, reportedly had a seizure that lasted for 5 or possibly 10 minutes.
2) About six weeks back, she had a couple of episodes of hand jerking. She's also had some episodic spells of unclear etiology.
3) As she is already on Neurontin, I feel that it's reasonable to increase the maintenance dose to 1,800 mg a day. I've suggested that she take the bulk of the medication at night. She has trouble sleeping and hopefully, this should help her. I've suggested that she take 300 mg in the morning, 300 mg in the afternoon and 1,200 mg at night.
4) An EEG will be performed.
5) Some of her cognitive problems may be from the effects of other centrally acting medications including Effexor and Lorazepam.
6) Various aspects of management were discussed at length with her. I have discussed with her state regulations regarding driving in patients with possible seizures.
7) Some other newer anticonvulsants with less cognitive effects could be considered. However, for financial reasons it may be difficult to switch her over.
8) Also, should she continue to have further spells, perhaps the input of Dr. Pawar could be obtained. She has seen her in the past and has investigated her with EEG's, etc.
9) She will call me back on the EEG..

## John F. Brick, M.D., 6/24/04, (Tr. 156)
Report: This was an extended EEG that was carried out with simultaneous video monitoring on the last day of the patient's admission. Background rhythms of 11 Hz are seen. No specific epileptiform activity was present. The patient experienced no seizures.

## John F. Brick, M.D., 6/24/04, (Tr. 157)
Clinical Interpretation: The baseline record is normal.

## John F. Brick, M.D., 6/24/04, (Tr. 158)
Clinical Interpretation: the 24 hour video EEG is unremarkable.

## Dr. Palada, 6/28/04, (Tr. 154)

Discharge diagnosis: Atypical seizures

**DDS Physician,, 2/26/05, (Tr. 164)**
Physical Residual Functional Capacity Assessment
Exertional Limitations: None established
Postural Limitations
Climbing ramp/stairs: frequently
Climbing ladder/rope/scaffolds: Never
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: Hazards - avoid concentrated exposure.
Symptoms: The claimant reports that she is able to do things around the house but usually has help in the event that she has a seizure. She does not drive due to this. She is currently working one day per week as a hairdresser. Under treatment with meds and under fairly good control. ADL's limited by seizure such as driving. Non-severe with light/hazards restrictions.

**United Hospital Center, 3/28/05, (Tr. 182)**
Impression: unremarkable unenhanced head CT.

**United Hospital Center Emergency Department, 3/28/05, (Tr. 259)**
In the emergency department the patient is evaluated with laboratory studies, computed tomography of the head, electrocardiogram, pulse oximetry monitoring, and oxygen 2 liters via nasal cannula. All studies were essentially normal. The patient has also a normal computed tomography of the head.

**Dr. Adnan Alghadban, M.D., United Hospital Center, 3/28/05, (Tr. 261)**
Differential Diagnosis: The patient most likely has anxiety attacks, causing her symptoms. Conversion disorder also is a possibility. The patient will continue taking Neurontin 600 milligram 3 x a day for seizures. I will switch her Ativan to Xanax .05 milligram twice a day. Also I would like to start her on Lexapro 10 milligram a day. The patient used to be on Effexor before. She stopped taking it for about a year, but she was restarted taking it about a week ago. I think Lexapro would be a better choice, since it has better effect on her anxiety. I will get an electroencephalogram in the morning. I don't think there is any further imaging at this time needed since the patient had a computed tomography scan today and had a magnetic resonance imaging before in Morgantown. The patient will be followed up by Dr. Pawar in Morgantown after her discharge.

**Dr. William G. Bowles, M.D., United Hospital Center, 3/29/05, (Tr. 263)**
Neurologic: The neurologic examination appears to be grossly intact. No sensory or motor deficits noted.
Assessment and plan: 1) Unresponsive episode. 2) Depression. 3) Anxiety.

**United Hospital Center, 3/29/05, (Tr. 180)**

4

<u>Interpretation</u>: Normal awake electroencephalogram.

**Dr. McClure, M.D., 4/6/05, (Tr. 195)**
<u>Diagnosis</u>:
Axis I: MDE, PAML
Axis III: seizure disorder
Axis IV: 3/6
Axis V:75/75

**Dr. Adnan Alghadban, M.D., 4/14/05, (Tr. 231)**
Examination showed normal strength reflexes and coordination.

**Dr. Simon McClure, 6/11/05, (Tr. 254)**
<u>Diagnosis</u>: 296.26 - major depressive disorder in full remission; panic.

**Dr. Adnan Alghadban, M.D., 6/30/05, (Tr. 230)**
Examination showed normal strength reflexes and coordination.

**Dr. Adnan Alghadban, M.D., 7/14/05, (Tr. 229)**
Examination showed normal strength, reflexes, and coordination.

**Dr. Adnan Alghadban, M.D., 7/26/05, (Tr. 228)**
<u>Description</u>: this is a digitally acquired EEG. The background frequency was a mix of alpha and beta range. It was symmetrical bilaterally, and more prominent in the posterior leads. Hyperventilation and photic stimulation both were performed and none of them elicit any abnormal activity. EKG monitoring during the EEG tracing did not show any significant arrhythmias.
<u>Conclusion</u>: Normal awake EEG.

**Dr. Simon McClure, 9/8/05, (Tr. 253)**
<u>Diagnosis</u>: 296.26 - major depressive disorder in full remission; panic.

**Peggy Allman, M.A., 10/31/05, (Tr. 197)**
<u>Diagnostic Impressions</u>:
Axis I: 293.83 Mood disorder due to seizures
Axis II: 300.01 Panic Disorders without Agoraphobia
Axis III: 293. 84 Anxiety Disorder due to seizures
Axis IV:V71.09 No diagnosis
Axis V: Seizure disorder as reported by the claimant.
<u>Diagnostic Rationale</u>: The claimant was mildly anxious during the evaluation and had broad affect. She was cooperative and pleasant. She reports that since her first seizure in 1999, she has progressively become more depressed and anxious, including the developments of panic disorder. She is uncomfortable around crowds because she is afraid she is going to have a seizure. She worries excessively, feels anxious often and indicates that this worrying and

anxiety interfere with her functioning on a regular basis. Both the Mood Disorder and the Anxiety Disorder appear to be directly connected to the advent of seizure disorder and concomitant restrictions. She reports difficulty with sleep, crying easily, low energy, feeling down and occasionally suicidal ideation.

Prognosis: Good

Social Functioning: Her social interactions with the examiner was within normal limits. She reports that she has a lot of social interactions with her family and enjoys watching TV and attending Church.

Concentration: As measured by Serial Sevens was severely deficient.

Persistence and Pace: Were both within normal limits.

Immediate memory: Was mildly deficient and recent memory was within normal limits.

## Philip E. Comer, Ph.D., DDS Physician, 11/10/05, (Tr. 200)

Psychiatric Review Technique

Medical Dispositions: RFC Assessment Necessary

Category(ies) Upon Which the Medical Disposition is Based: 12.04 Affective Disorders; 12.06 Anxiety-Related Disorders.

Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Mood disorder due to seizures.

Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experience in the attempt to master symptoms as evidenced by at least one of the following: Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Without agoraphobia.

A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Anxiety Disorder due to seizures.

Rating of Functional Limitations

Restriction of Activities of Daily Living: Mild

Difficulties in Maintaining Social Functioning: Moderate

Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" criteria.

Consultant's Notes: Claimant's dual and interacting diagnoses are serious but do not meet or equal listings. However, two moderate limitations B Criteria rating (#s 2,3), call for a RFC Assessment. Claimant appears to be functioning better with treatments and medications. Her statements are credible from her perspective. (See RFC).

## Philip E. Comer, Ph.D. DDS Physician, 11/11/05, (Tr. 214)

Mental RFC Assessment

Understanding and Memory:

    Ability to remember locations and work-like procedure: not significantly limited

    Ability to understand and remember very short and simple instructions: not significantly limited

    Ability to understand and remember detailed instructions: moderately limited

<u>Sustained concentration and persistence</u>

Ability to carry out very short and simple instructions: not significantly limited

Ability to carry out detailed instructions: moderately limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: not significantly limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: not significantly limited

Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: not significantly limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: Claimant's functional capacity limitations do not exceed moderate and do not call for a RFC assessment. Claimant has the mental/emotional capacity for routine repetitive activity, in a low stress supportive work environment and that can accommodate her physical limitations.


**Dr. Adnan Alghadban, M.D., 12/8/05, (Tr. 227)**

Her examination today showed normal mental status, cranial nerves, motor strength, reflexes, coordination and gait.

<u>Plan</u>: I'm planning to continue on the current medications. I think once the stress resolves her seizures will improve. I will see the patient for follow up in 3 months for follow up.


**Dr. Simon McClure, 12/12/05, (Tr. 251)**

<u>Diagnosis</u>: 296.26 - major depressive disorder in full remission; panic.

**Dr. Adnan Alghadban, M.D., 12/16/05, (Tr. 244)**

Summary: nerve conduction studies: Right ulnar and median motor and sensory responses were normal. Right sural and superficial peroneal sensory responses. Needle examination of selected right upper and lower extremity muscles were normal.

Impression: This is a normal study. There is not electro physiological evidence of neuropathy or myopathy in this patient.

**DDS Physician, 12/20/05, (Tr. 218)**

Physical RFC Assessment

      Exertional Limitations: None established

      Postural Limitations

      Climbing ramp/stairs: frequently

      Climbing ladder/rope/scaffolds: Never

      Manipulative Limitations: None established

      Visual Limitations: None established

      Communicative Limitations: None established

      Environmental Limitations: Hazards - avoid all exposure (seizure disorder)

      Symptoms: Claimant with history of epilepsy. Last neurology note from Dr. Alghadban is from July 2005 states that he has a combination of seizure and pseudoseizures.

      Additional comments: Follow up note from Dr. Alghadban from December 8, 2005 seen claimant with seizure disorder, she should avoid unprotected climbing, heights and hazards.

**Dr. Simon McClure, 1/11/06, (Tr. 249)**

Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Simon McClure, 2/8/06, (Tr. 248)**

Had a seizure last week.

Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Adnan Alghadban, M.D., 2/10/06, (Tr. 226)**

In my professional opinion, I think the patient cannot handle work at this time, given her seizure and depression condition.

**Dr. Adnan Alghadban, M.D., 2/10/06, (Tr. 242)**

Her examination today showed normal mental status, cranial nerves, reflexes, coordination, and gait.

**Dr. Simon McClure, M.D., 2/16/06, (Tr. 236)**

I am treating Mrs. Rebrook for her major depression and panic disorder. Despite compliance with treatment she still suffers from poor concentration, poor energy, emotional lability, and agoraphobia, which will prevent her from seeking out or reliably maintaining gainful competitive employment in the community for the next 18-24 months.

**Dr. Simon McClure, 3/9/06, (Tr. 247)**
Diagnosis: 296.26 - major depressive disorder in full remission

**Dr. Adnan Alghadban, M.D., 3/17/06, (Tr. 241)**
Description: This is a digitally acquired EEG. The background frequency was predominantly in beta range. It was symmetrical bilaterally more prominent in the posterior leads. Photic stimulation and hyperventilation both were performed and none of them elicit any abnormal activity. EKG monitoring during this recording did not show any significant arryhthmias.
Conclusion: Normal awake EEG.

**Dr. Adnan Alghadban, M.D., 10/2/2006 (R. 616).**
Description: The patient has mix of pseudo-seizures and real seizures. She used to be on Lyrica 75 mg twice a day but she has gained a significant amount of weight since I have seen her the last time. She seems to have good control of her seizures. The patient also has lots of headaches, neck pain, back pain and this is most likely due to fibromyalgia. Her examination today showed normal mental status, cranial nerves, reflexes coordination and gait.

**Dr. Simon McClure, M.D., 10/16/06, (Tr. 278)**
Mental RFC Assessment
Understanding and Memory:
    Ability to remember locations and work-like procedure: not significantly limited
    Ability to understand and remember very short and simple instructions: moderately limited
    Ability to understand and remember detailed instructions: markedly limited
Sustained concentration and persistence
    Ability to carry out very short and simple instructions: not significantly limited
    Ability to carry out detailed instructions: markedly limited
    Ability to maintain attention and concentration for extended periods: markedly limited
    Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: markedly limited
    Ability to sustain an ordinary routine without special supervision: moderately limited
    Ability to work in coordination with or proximity to others without being distracted by them: moderately limited
    Ability to make simple work-related decisions: moderately limited
    Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: markedly limited.
Social Interaction
    Ability to interact appropriately with the general public: not significantly limited
    Ability to ask simple questions or request assistance: not significantly limited
    Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
    Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: moderately limited

Adaptation

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: moderately limited

Ability to travel in unfamiliar places or use public transportation: moderately limited

Ability to set realistic goals or make plans independently of others: not significantly limited.

**Dr. Simon McClure, 10/16/06, (Tr. 282)**

Psychiatric Review Technique

Category(ies) Upon Which the Medical Disposition is Based: 12.04 Affective Disorders; 12.06 Anxiety-Related Disorders.

Affective Disorders: Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:

Depressive syndrome characterized by at least four of the following:

Anhedonia or pervasive loss of interest in almost all activities, or

Sleep disturbances, or

Psychomotor agitation or retardation, or

Decreased energy, or

Feelings of guilty or worthlessness, or

Difficulty concentrating or thinking.

Anxiety-Related Disorders:

Anxiety as the predominant disturbance or anxiety experience in the attempt to master symptoms as evidenced by at least one of the following:

Generalized persistent anxiety accompanied by three of the following: motor tension, apprehensive expectation, or vigilance and scanning.

Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week.

Rating of Functional Limitations, re 12.04 and 12.06.

Restriction of Activities of Daily Living: Marked

Difficulties in Maintaining Social Functioning: Marked

Difficulties in Maintaining Concentration, Persistence or Pace: Marked

Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Medically documented history of a chronic organic mental (12.02), schizophrenic (12.03), or affective (12.04) disorder of at least 2 years duration that has caused more than minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

The following evidence appears to be from after the remand and pursuant to the new application, which was consolidated with the former.

On November 7, 2006, neurologist Dr. Alghadban noted that Plaintiff had a history of seizures, migraine headaches and fibromyalgia. Topamax seemed to be help her seizures but she still had break-through seizures. She had been treated for fibromyalgia and was recently diagnosed with systemic lupus erythematous. She had severe arthralgia, swelling in her joints, and severe skin rash. She was on a "huge dose" of Prednisone which seemed to not be helping much. Examination showed severe tenderness over the neck, back, and upper and lower extremity joints. She gained a lot of weight. Reflexes and motor strength were normal. Dr. Alghadban opined that Plaintiff had uncontrolled seizures, severe systemic lupus erythematous and severe fibromyalgia. He opined that she was completely disabled.

On November 16, 2006, Dr. Alghadban again noted Plaintiff had a history of seizures and pseudoseizures. He had switched her several months earlier from Lyrica to Topamax due to weight gain. She had since been diagnosed with lupus erythematous by dermatologist Dr. Franz after a skin biopsy. Her labs were not abnormal. She was taking prednisone. She also seemed to be depressed and having lots of pain in her joints and arthralgia. Examination was normal, but she still had "lots" of weight gain.

On November 17, 2006, State Agency reviewing psychologist Bob Marinelli completed a Psychiatric Review Technique finding Plaintiff had no severe psychiatric impairments (R. 633). She would have only mild limitations. Dr. Marinelli had reviewed records up to October 2006, and opined that Plaintiff's reports of functioning appeared credible.

On November 21, 2006, Plaintiff presented to Shelly P. Kafka. M.D. of the UHC

Rheumatology and Osteoporosis clinic for follow-up of her lupus (R. 668). Upon examination, Plaintiff was well-appearing and in no acute distress (R. 670). There were areas of extreme erythema over her face, neck, low back, gluteal regions, thighs and arms. Her strength and reflexes were normal, with no neurological defects. Musculoskeletal examination was all within normal limits with good range of motion and no tenderness. The doctor suggested consideration of cutaneous lupus, since ANA was barely positive and titer tests were normal. The doctor's impression was that Plaintiff had "a rather significant rash and polyarthralgia, which could include diagnoses of connective tissue diseases" (of which lupus is one). He advised further testing to rule out lupus, and if all tests were negative would also need to consider whether the rash was induced by her medications. A November 21, 2006, test for lupus was negative (R. 699).

That same date, State Agency reviewing physician Fulvio Franyutti, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk about 6 hours in an 8-hour workday; and could sit about 6 hour in an 8-hour workday (R. 649). She could never climb ladders, ropes or scaffolds and could occasionally do all other posturals. She would have limited feeling due to paresthesias of the fingers. She should avoid concentrated exposure to cold, heat, vibration fumes, and hazards. He opined that Plaintiff appeared partially credible, but disagreed with Dr. Alghadban's opinion that she was disabled, opining instead that she could perform light work.

On January 3, 2007, Plaintiff told psychiatrist Dr. McClure she was not doing well (R. 829). Supportive therapy was helpful. She was now separated from her husband due to his drug problems, and was still trying to work. She was taking Topamax for seizures and prednisone for lupus. Upon mental status exam, Plaintiff was teary eyed, but calm.

On January 12, 2007, Dr. Alghadban noted Plaintiff had a history of seizures and pseudoseizures and was recently diagnosed with lupus erythematous (R. 613) Her workup was unremarkable, so he opined she may have skin lupus rather than systemic lupus. Nevertheless she was on a high dose of steroid, causing "cushionoid symptoms" including "mooney face, weight gain and redness." Her headaches seemed to be doing well. Examination was otherwise normal.

On March 8, 2007, Dr. Alghadban again noted Plaintiff had a history of seizures "for a long time" and was recently diagnosed with Lupus (R. 612). He opined she was completely disabled and could not perform any work. She also had severe headaches and migraines which were also debilitating.

On April 9, 2007, psychiatrist McClure noted Plaintiff had blotchy skin, and was emotional but calm. She reported it was difficult to function when her lupus flared up. She had been awarded nothing for child support and was upset. She did find therapy helpful.

On April 12, 2007, Dr. Alghadban noted Plaintiff had a past medical history of seizures which seemed to be controlled on Topamax, along with headaches that seemed to be improving (R. 611). She was also diagnosed with Lupus by Dr. Kafka. His examination was otherwise normal.

By July 2007, Dr. Kafka opined he doubted Plaintiff's rash was due to lupus, but if it was it was lupus it was of the cutaneous, not systemic type (R. 780).

On July 12, 2007, Dr. Alghadban noted that Plaintiff had a history of seizures and lupus and migraines. She had been having headaches almost every day around the time of her period. Examination showed no change (R. 610).

On October 11, 2007, Dr. Alghadban noted Plaintiff had a history of seizures, Lupus and migraines. He reported: "She had a seizure the other day because she was at the hospital. Her

father-in-law was very sick. I think that was possibly a pseudoseizure. She is also on Xanax twice a day." (R. 609). Examination showed no change. EEG was normal, but if she had more seizures the neurologist suggested raising her dosage of Topamax.

On November 19, 2007, Dr. Alghadban noted Plaintiff had "multiple medical problems including severe headache and severe fibromyalgia, lupus with seizure disorder." (R. 608). He reported she was on high doses of steroids and multiple medications for seizures and "has lots of neurological symptoms due to her fibromyalgia." She was unable to work or drive and was taking "lots of medications."

On December 11, 2007, Plaintiff told Dr. McClure she was doing pretty well on her medications (R. 817).

By February 2008, Dr. Kafka opined that Plaintiff might have UCTD (undifferentiated connective tissue disease)[1] or perhaps lupus limited to the skin, but doubted she had systemic lupus (R. 780).

On April 10, 2008, Plaintiff told Dr. McClure she was doing a little better– was not as panicky– but did not like the side effects of Remeron, including fatigue and appetite (R. 815).

On May 8, 2008, Dr. Alghadban stated that Plaintiff had a history of seizures, migraine headaches and fibromyalgia (R. 805). She had had break through seizures a few times since her last

---

[1]The term undifferentiated connective tissue diseases is used to define conditions characterized by the presence of signs and symptoms suggestive of a systemic autoimmune disease that do not satisfy the classificative criteria for defined connective tissue diseases such as systemic lupus erythematosus, Sjogren's syndrome, rheumatoid arthritis and others . . . .The most characteristic symptoms of UCTD are represented by arthritis and arthralgias, Raynaud's phenomenon, leukopenia, while neurological and kidney involvement are virtually absent. PubMed.gov. U.S. National Library of Medicine National Institutes of Health. http://www.ncbi.nih.gov/pubmed/17110308.

visit. Examination that date was normal. He increased her Topamax.

On May 12, 2008, Plaintiff presented to psychologist Peggy Allman, MA for a Mental Status Examination on request of the State Disability Determination Service (R. 751). Plaintiff's chief complaint was "epilepsy, lupus, panic attacks, general anxiety, depression, when you don't like to go out." She was currently working two days a month as a beautician. She said she had problems with sleep, fair appetite, crying episodes, and low energy. Her mood was down. She was extremely frightened of crowds, and experienced panic attacks at any time. She did not report OCD, PTSD, ADD, nor bipolar disorder, and said she had not been anxious until the seizures and lupus disorder. She was anxious at the start of the evaluation, with sweaty palms. It was noted the same psychologist had performed an evaluation in 2005, in which she diagnosed mood disorder due to seizures, panic disorder, and anxiety disorder due to seizures. Plaintiff was currently being treated for anxiety, depression, and panic disorder by Dr. Simon McClure.

Upon mental status examination, Plaintiff has a positive attitude and was cooperative (R. 753). She had good eye contact and verbal responses. She had a sense of humor and was spontaneous. Speech was relevant and coherent with good pace. She was fully oriented. Her mood was depressed, anxious, and sad with restricted affect. There was no evidence of disturbance of thought. Insight appeared normal, as did judgment. Immediate memory was mildly deficient and concentration was severely deficient.

Plaintiff described her daily activities as getting up at 6 to help her daughter get ready for school; taking a nap; watching tv; fixing breakfast; and taking her medications. She could care for her own hygiene, but one of her daughters stayed by the door in case she had a seizure in the shower. She did not cook much, but cleaned and washed clothing. She shopped only as necessary and did

not drive.

Ms. Allman found Plaintiff's interactions with her were within normal limits. Plaintiff reported no social functioning. Her concentration was severely deficient, her immediate memory mildly deficient, and her persistence and pace within normal limits.

Ms. Allman also completed an Ability to do Work-Related Activities Form (mental) (R. 756). She opined Plaintiff would have mild problems interacting appropriately with supervisors and coworkers and responding appropriately to usual work situations and changes in a routine work setting. She would have moderate problems interacting appropriately with the public. Her limitations would otherwise be none or mild.

Ms. Allman diagnosed panic disorder with agoraphobia, anxiety disorder due to lupus and seizure disorder, and mood disorder due to lupus and seizure disorder. Her prognosis was listed as poor.

On May 17, 2008, Plaintiff was at her doctor's office when a 911 call was made to the Anmoore EMS for onset of seizure activity (R. 870). Upon arrival, Plaintiff was lying on floor under a blanket. She stated she did not want to go with EMS and did not want to be treated. She could state the time of day, President of the United States, and day of the week. She was told she had to sit up and stand to move to a chair and sign off an a release of responsibility. She said she would sign off, and that she was at her doctor's office for a rash and chest hurting possibly from bronchitis. EMS workers noted that upon their arrival she was groggy and postictal from seizure. Her father went to the doctor's office staff and tried to get the doctor to see her but the doctor would not see her. The EMS assisted her out to her father's car. Then staff said the doctor would see her and her father took her back into doctor's office. EMS left the scene.

On May 19, 2008, Plaintiff underwent a Disability Determination Examination, performed by B. G. Thimmappa, M.D. for the State Disability Determination Service (R. 759). Upon examination, Plaintiff could walk, walk on heels and toes, write and pick up coins normally. She could squat with difficulty. She communicated normally and appeared alert and well-oriented with good memory and judgment. There was no evidence of skin rash at the time of the examination, except there was a slight mottling appearing over her legs. Neurologic exam was normal, with straight leg raising negative. There was crepitation of the knee joints, with pain, but no restriction. Dr. Thimmappa diagnosed history of epilepsy, history of depression with anxiety, history of eruptive lupus, and arthralgias.

Due to her arthralgia. Dr. Thimmappa opined Plaintiff could lift only up to 10 pounds. She could stand and walk one hour at a time and sit four hours at a time. She could sit a total of 4 hours in an 8-hour workday, and stand and walk 2 hours each in an 8-hour workday. She would not require a cane. She could frequently perform all posturals. She could only occasionally operate foot controls (up to 1/3 of a workday). She could never climb stairs, ramps, ladders or scaffolds, kneel, crouch or crawl, and could only occasionally balance or stoop. She should never work around unprotected heights, moving mechanical parts, or operating a motor vehicle due to her history of seizures. She could occasionally work in cold, heat, or vibrations. He also opined she could not travel without a companion due to her history of seizure. He finally opined the seizure disorder was expected to last for 12 months.

On June 30, 2008, Plaintiff told Dr. McClure her father had passed away (R. 810). She was tearful and her lupus and nerves seemed to have worsened. Supportive therapy was helping.

On August 11, 2008, Plaintiff had a normal chest x-ray (R. 800).

17

From about November 2007, through September 8, 2008, Plaintiff saw Dr. Sean Keesee, M.D., for stomach and stress issues (R. 790). She said about a week before her period that she got really fatigued, had stomach problems, nausea, and spells of passing out. She was diagnosed with symptoms of IBS, Reflux, Anxiety, Tobacco addiction, skin rash (possible lupus), seizure disorder, and aches and pains. Dr. Keesee wrote a "To Whom it May Concern" letter on August 25, 2008, stating that Plaintiff had "a Lupus like illness that leads to periods of increased musculoskeletal pain;" longstanding anxiety disorder; and "a seizure disorder that is not uniformly controlled" and "keeps her from driving or working in many potentially dangerous environments." He did not opine she was disabled, but opined that obtaining employment with the above problems would be difficult.

On August 28, 2008, Dr. Alghadban stated that Plaintiff had a history of seizures. She also had migraine headaches, fibromyalgia, and lupus (R. 804). She was still having episodes of seizures, and seemed to be under a lot of stress due to her father's recent death. She was also having "lots" of neck and back pain. Her examination was unchanged. Dr. Alghadban continued Topamax and advised a 24-hour EEG, stating "[i]f there was anything to suggest ongoing seizures" he might switch or add to her medications.

On September 22, 2008, Plaintiff's treating Psychiatrist , Dr. McClure completed a PRT and Mental Ability to do Work Assessment, based on affective disorder and anxiety-related disorder (R. 836). He opined she had a depressive syndrome and anxiety with recurrent, severe panic attacks and agoraphobia. He opined she had marked restriction of daily activities and maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace, and had three episodes of decompensation, which in total would meet the listings for a mental impairment. He also opined she met the "C" criteria of the listings due to repeated episodes of decompensation, and a

complete inability to function independently outside the home.

Dr. McClure found Plaintiff would have poor ability to deal with work stresses, maintain attention and concentration, understand, remember and carry out complex job instructions, and demonstrate reliability. She would have a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations. function independently, and understand, remember and carry out detailed but not complex job instructions.

On November 3, 2008, Dr. Alghadban wrote a letter to Plaintiff's counsel stating:

This is in regard to my patient Shari Rebrook. I have treated her for a seizure disorder for several years now. She has a combination of seizures and pseudoseizures. Pseudoseizures are very real and should not be thought of as less significant. They are very real to the patient and are not intentionally faked or feigned. In many ways pseudoseizures are more difficult to treat because the cause is largely unknown and they are not always responsive to medications. Oftentimes pseudoseizures are a manifestation of a past trauma, stress or other mental condition. In this case, I believe her pseudoseizures are related to her overall mental conditions. They are just as real and debilitating.. She's currently on high doses of Topamax. Topamax is a new generation of antiseizure medication that does not require blood level monitoring. Blood level monitoring was required with the older medications.......Ms. Rebrook's neurological exam on office visits is generally normal, however, this is expected in a seizure disorder. This should have no bearing in her claim because unless she has a seizure in my office, I'm likely not going to find neurological abnormalities. Her EEGs are also generally normal. However, this is often seen in patients with seizure disorders and does not indicate that Ms. Rebrook does not have a seizure disorder or is embellishing her complaints. I have found her to be very credible in her complaints and am unaware of any medical reason to question the veracity of her symptoms. She has sought and received appropriate treatment in order to relieve her condition. She has been compliant with my treatment recommendations and her medications. Why does she still have seizures despite treatment? Modern medicine cannot answer this question. I don't know why. I just know she does. I don't have any indication that she continued to have seizures due to noncompliance with treatment.

A seizure disorder is something that affects the patient differently from day to day. Some days she has seizures and some days she doesn't. The condition is very unpredictable. While Ms. Rebrook has had periods of better control, she's never had long term control of her seizures. As I stated in my February 10 2006 letter, she has about 2-3 more significant seizures a month. She also has many smaller episodes on

a weekly basis. Although the major seizures last a short period of time they cause her significant symptoms afterward.

In addition to the seizure disorder, Ms. Rebrook suffers with lupus erythematosus and migraine headaches. Lupus is an autoimmune disease that can be fatal. This disease is unpredictable and causes frequent flare ups with periods of remission. Ms. Rebrook particularly suffers with skin rash, joint pain and fatigue, which are common symptoms caused by lupus. This greatly limits her ability to perform any amount of walking, standing of lifting. When she has flare ups she will be limited in even her activities of daily living due to joint pain and fatigue. Migraine headaches are debilitating when they occur and often require total rest.

Because of these conditions any employer would have to accommodate frequent absences. If she has a seizure a flare of lupus or a migraine she will mis work or have to leave her shift. This will happen more than 2-3 times a month. The unpredictable nature of her impairments will make her a very unreliable employee. She could not maintain a set schedule no matter what kind of work it was. I feel that she has been disabled with the above limitations since 2003 and the later lupus diagnosis just made her even more limited.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act s as to be insured for such benefits only through March 31, 2007.

2.  The claimant has not engaged in any apparent substantial gainful activity since the August 30, 2003, date of alleged disability onset, i.e., the "period at issue" herein. (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: history of skin rash; history of seizures or pseudoseizures; depressive disorder; and anxiety-related disorder (20 CFR §§ 404.1520(c) and 416.920(c)).

4.  During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have

presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform a range of work activity that: requires no more than a "light" level of physical exertion; affords opportunity for brief (one-to-two-minute) changes of position at least every half-hour; requires no climbing of ladders, ramps, ropes, scaffolds or stairs; requires no more than occasional balancing, crawling, crouching, kneeling or stooping; entails no exposure to excessive vibration, temperature extremes, airborne irritants/ environmental pollutants (e.g., chemicals, dust, fumes, gases, noxious odors, smoke) or significant hazards (e.g., dangerous moving machinery, unprotected heights); requires no driving as a part of job duties; requires no more than frequent fine fingering; entails no duties that require contact with the general public or close interaction with coworkers or supervisors; presents no more than occasional changes in the work setting; involves no fast paced or assembly line type of duties; and accommodates up to two unscheduled workday absences per month (20 CFR sections 404.1520(e) and 416.920(e)).

6. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of her "vocationally relevant" past work as a cosmetologist (20 CFR §§ 404.1565 and 416.965).

7. The claimant throughout the period at issue is appropriately considered for decisional purposes as a "younger individual [age 18-44]" (20 CFR §§ 4040.1563 and 416.963).

8. The claimant has attained a "high school" education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9. The claimant has a "skilled/semi-skilled" employment background but has acquired no particular work skills that are transferable to any job that has remained within her residual functional capacity to perform during the period at issue (Social Security Ruling 82-41, and 20 CFR sections 404.1568, 416,968, and Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).

11.  The claimant has not been under a "disability" as defined in the Social Security Act, at any time during the period at issue herein, i.e., since August 30, 2003 (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 332-349).

## IV. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions

Plaintiff contends:

1.  The ALJ erred because he refused to follow this court's previous order.

2.  The ALJ erred because he failed to properly consider Ms. Rebrook's severe impairments at Step Two of the sequential evaluation process.

3.      The ALJ erred because he based a significant portion of the decision on pure unsupported speculation.

4.      The ALJ erred because he failed to properly consider Ms. Rebrook's credibility.

5.      The ALJ erred because he failed to properly consider medical opinions favorable to Ms. Rebrook.

Defendant contends:

1.      The ALJ's decision complies with this Court's Remand Order.

2.      The ALJ correctly evaluated the severity of Plaintiff's impairments at Step Two of the sequential evaluation process.

3.      The ALJ did not speculate but correctly found Plaintiff not credible.

4.      The ALJ's credibility analysis is proper.

5.      The ALJ correctly considered all the medical opinion evidence of record.

## C. This Court's Previous Order

Plaintiff first argues that the ALJ erred by refusing to follow this Court's previous order. Defendant contends the ALJ's decision complies with this Court's previous remand order. Significantly, in his first decision at Step Two, the ALJ found Plaintiff had a medically determinable seizure disorder, which alone or in combination with her depression and anxiety, was severe. Neither party argued that the ALJ's Step Two finding of severe impairments was improper. In fact, Defendant at the time conceded "the ALJ determined that Plaintiff had a seizure disorder, depressive disorder, and anxiety disorder, severe impairments." In reliance on that Second Step determination, the parties argued only concerning the ALJ's treatment of Plaintiff's seizure disorder at the Third Step (the Listings). The ALJ evaluated Plaintiff's seizure disorder under Listings 11.02 and 11.03, both dealing

with seizures. Neither party argued that the ALJ should not have utilized those listings, but only what version of the listings had been used. The Court reversed and remanded the ALJ's earlier decision based in part on his having utilized the old, outdated seizure listings instead of the new, revised seizure listings. Significantly, the Court also reversed and remanded based on the ALJ's rejection of Dr. Alghadban's opinion. In his Report and Recommendation Magistrate Judge Seibert wrote:

> Although the record does fail to document the presence of abnormal brain activity suggestive of seizures or epilepsy, the record documents Claimant continues to have seizures, Dr. Alghadban continued to prescribe seizure medication to Claimant, and also contains detailed testimony from Claimant and family members documenting the severity of Claimant's seizures.

(R. 36)(Emphasis added). Magistrate Seibert later found:

> Claimant's RFC and the hypothetical to the VE did not sufficiently account for Claimant's limitations arising from her seizures. As evidenced above, the RFC and hypothetical provide for Claimant missing one day of work per month. However, the record suggests Claimant may need to miss more than one day of work per month. Claimant testified she experiences one to two grand mal seizures per month, a partial seizure weekly, and focal seizures daily . . . . Additionally, multiple friends and family testified to witnessing Claimant's seizures and Dr. Alghadban believed Claimant's seizures rendered her unable to work . . . . Finally, the ALJ himself concluded Claimant's seizures, in combination with depressive and anxiety disorders, were severe . . . Accordingly, the case must be remanded for further consideration of Claimant's RFC in light of the above evidence . . . .

(Emphasis added). As already noted, neither party objected to any of the facts or conclusions in Magistrate Judge Seibert's Report and Recommendation. Four months later, Judge Stamp entered an order adopting the Report and Recommendation. The Appeals Council then remanded the claim to an ALJ "for further proceedings consistent with the order of the court."

In his new decision the ALJ no longer finds Plaintiff has a seizure disorder. He now finds Plaintiff has only a "history of seizures or pseudoseizures." (R. 336). He then states that he "does not believe" that any fully credible and objective medical evidence of record indicates that the claimant

24

has a valid seizure disorder. He subsequently starts a sentence with: "Whether or not the claimant has or believes that she has pseudoseizures . . . ." The ALJ never needs to address the issue upon which the claim was remanded– the revisions to Listings 11.02 and 11.03– because he decides the impairment is not properly evaluated under those listings at all, but is, instead, a psychological disorder properly analyzed under 12.07, somatoform disorders, even though that "diagnosis" has never been made by any physician or psychologist of record.

The undersigned finds the ALJ did not comply with the Court's prior Order or that of the Appeals Council. Further, the undersigned finds substantial evidence does not support the ALJ's Step Two finding that Plaintiff had only a "history of seizures or pseudoseizures," no valid seizure disorder at all, and had, instead a somatoform disorder.

For this reason alone, the undersigned United States Magistrate Judge finds this case must be remanded to the Commissioner, if not for an outright award of benefits, at least to a different ALJ "for further proceedings consistent with the [prior] order of the Court." As this is a Report and Recommendation, however, the undersigned will discuss each of the parties' contentions in turn.

### 1.The Listings

In its previous Order, the Court found (in adopting Magistrate Judge Seibert's R&R):

> [T]he ALJ applied an incorrect legal standard in the third step, namely the outdated requirement of Listings 11.02 and 11.03 that Claimant provide evidence of a positive EEG. Effective May 24, 2002, Listing 11.02 and 11.03 no longer required "an EEG be part of the documentation needed to support the presence of epilepsy" because "it is rare for an EEG to confirm epilepsy in its other forms for either adults or children." See 67 F.R. 20018, *20019. The revised Listing 11.02 now requires documentation of "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment" with daytime episodes or nocturnal episodes "manifesting residuals which interfere significantly with activity

during the day." 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02. The revised Listing 11.03 now requires "detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." Id. at § 11.03. Despite the above revisions to the Listings, the ALJ in the present case stated, "[i]n regards to her seizure disorder, the claimant does not meet or equal Listings 11.02 or 11.03, as interpreted by SSR 87-6. The claimant has had no positive EEGs. More importantly, no specialist has explained why the claimant continues to have seizures in spite of prescribed treatment and medication, as required by SSR 87-6. The undersigned believes that there is a very big question as to whether the claimant has real seizures at all." (Tr. 22). Although it appears the ALJ relied on criteria from both the outdated and revised Listings, and although it is possible the ALJ did not intentionally reference the outdated Listings but was merely noting the absence of positive EEGs in the record, the Court cannot ensure the ALJ employed the proper standards without further clarification from the ALJ. See Craig, 76 F.3d at 589. Accordingly, the case must be remanded <u>for evaluation of the Listings using the revised standards.</u>

(Emphasis added).

As found in the prior Order, there is absolutely no requirement or even mention of positive EEG's, CT scans or MRI's in the revised listings. The Court remanded the case expressly for evaluation using the revised standards. In his new decision pursuant to the remand, the ALJ writes, "the undersigned has considered her reported symptoms and related medical findings in conjunction with listings 11.02, 11.03, and 12.07 and Social Security Ruling 87-6 . . . ." (R. 338). Regarding the listings, he first notes that treating neurologist Alghadban stated that Plaintiff had <u>a combination of seizures and pseudoseizures.</u> The ALJ then finds:

> In offering that the claimant's "pseudoseizures" are "very real" to her, Dr. Alghadban would appear to remove from consideration serious evaluation of the claimant's reported seizure activity in conjunction with the severity criteria of Epilepsy listings 11.02 and 11.03 . . . .

Significantly, the ALJ then writes:

Dr. Alghadban acknowledges that the claimant's neurological examinations at his office were "generally normal" but that such consistent findings should have no real bearing and were to be expected absent witnessing actual seizure activity in his office (exhibit 37F/1)[However, many, though not all, seizure disorders can be evaluated with EEGs, brain MRIs and brain CT scans – unfortunately such tests have all been negative in this case.] Thus, it does not appear that Dr. Alghadban has ever witnessed any actual "seizure" activity during the course of his treatment of the claimant. The physician also acknowledges that the claimant had undergone "generally normal" electroencephalogy ("EEG") studies on multiple occasions. He again countered – in effect – that such normal results did not "rule out" the possibility of a seizure disorder.

The undersigned finds that although the ALJ may not have expressly "required" an abnormal EEG, he certainly used the lack of same in large part to rule out any consideration of the Listings. He specifically reiterated from his first decision that "many, though not all, seizure disorders can be evaluated with EEGs . . . ." This statement is simply incorrect, where the express reasoning for striking that requirement from the listings was that "it is <u>rare</u> for an EEG to confirm epilepsy in its other forms for either adults or children." <u>See</u> 67 F.R. 20018, *20019 (Emphasis added).

Further, the undersigned finds no support for the ALJ's finding that Dr. Alghadban having defined pseudoseizures and stating that they are "very real" to Plaintiff somehow "removes them from consideration" under Listings 11.02 and 11.03. To clarify, Dr. Alghadban, Plaintiff's long-time treating neurosurgeon, stated that she had a <u>combination of</u> seizures and pseudoseizures. He did not say she suffered only from pseudoseizures. The undersigned therefore further finds substantial evidence does not support the ALJ's Step Three determination because he did not comply with the requirements for evaluation of the listing propounded by the Fourth Circuit <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1985). In that case, the Fourth Circuit held:

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence

of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

The ALJ here did identify the relevant listed impairments. He did not, however, compare the listed criteria to the evidence of Plaintiff's symptoms. As noted in the prior Order, the revised listings require "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment" with daytime episodes or nocturnal episodes "manifesting residuals which interfere significantly with activity during the day" or "detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." Although there were such detailed descriptions of Plaintiff's seizures provided in the record, the ALJ never did compare the listings to any of those described symptoms.

The Court finds the Seventh Circuit case of <u>Boiles v. Barnhart</u>, 395 F.3d 421, 102 Soc. Sec. Rep. Serv. 84 (7th cir. 2005) instructive in this regard. In that case the claimant appealed solely on the grounds that her pseudoseizures were medically equivalent to a listed impairment. The claimant was referred to a neurologist who opined that pseudoseizures were a "significant possibility," and prescribed Depakote "as a seizure medication." <u>Id</u>. at 423. The neurologist later prescribed Topamax, while noting he was still "not convinced these are seizures." After the claimant was finally diagnosed with pseudoseizures, the neurologist discontinued the anti-seizure medication. He provided a written evaluation regarding the claimant's pseudoseizures and her diagnosis. Like Dr. Alghadban, the neurologist opined that although the cause of pseudoseizures could not be identified, they resulted in genuine suffering and were often accompanied by other debilitating symptoms. He stated the claimant was untreatable and that it was his firm belief she could not work. Two non-treating

physicians consulted by the ALJ testified at the Administrative hearing (R. 424). One testified that a negative EEG did not mean that no seizure took place, and added that it would be unfair to "penalize someone suffering from pseudoseizures by not finding her disabled, because, like epileptics, it's very difficult for these people to get jobs." He emphasized that while pseudoseizures are not caused by epilepsy, they are "real."

A consulting psychologist agreed with the physician, noting that the cause of the pseudoseizures was unknown but there was nothing to suggest the claimant was malingering or faking seizures. The claimant argued that the ALJ erred in finding that her pseudoseizures were not equal in severity to a listed impairment "because he substituted his own judgment for that of the treating and consulting physicians without citing medical evidence." Id. Like the ALJ here, the ALJ in Boiles based his decision in part on the lack of EEG evidence. The Seventh Circuit found that the ALJ did not cite any evidence to contradict the consultative physician's opinion that a negative EEG was perfectly consistent with Boiles's type of seizure disorder and did not mean her seizures were any less real than those that could be measured by an EEG; "thus is was improper for the ALJ to use this lack of EEG evidence as support for his decision." The ALJ also did not explain how other evidence in the record contradicted Boiles's treating physician's opinion about the frequency of her pseudoseizures.

As in Boiles, the undersigned finds the ALJ here continued to improperly use the lack of a positive EEG, CT or MRI as evidence supporting denial of Plaintiff's claim. He also did not discuss whether Plaintiff's impairments, alone or in combination, may have equaled any listing. The ALJ also did not comply with this Court's remand order to evaluate Plaintiff's impairments using the revised listings.

29

The undersigned finds the ALJ also erred by substituting his opinion for every doctor's in the record as regards Plaintiff's seizure disorder. No treating, examining, consultative, or even reviewing (DDS) physician found Plaintiff did not have a seizure disorder. He also rejects every witness' report of observed seizures. No doctor or psychologist diagnosed Plaintiff with a somatoform disorder. Even assuming *arguendo* the ALJ is the only person to have correctly diagnosed Plaintiff, he was still required to compare each of the criteria of that listing to the evidence of her symptoms.

## 2. Third-Party Evidence

In this Court's previous remand, it found that the ALJ's conclusion regarding Plaintiff's credibility was not supported by substantial evidence "because he failed to consider statements from Claimant's friends and family members as to the severity of her seizures . . . ." The Report and Recommendation went so far as to expressly cite the pages in the record where some of those statements were found, "(Tr. 99, 112, 125, 226)." All are "Seizure Description" forms filled out by family or non-family members. Page 99 was completed by non-family member Kerry Wise in 2004, who stated that she had witnessed so many of Plaintiff's seizures she could not give dates, and "lost count" of how many there were. She described a typical seizure she had witnessed. Page 112 was completed by Plaintiff's parents, who stated they had witnessed several seizures, again describing a typical seizure. Page 125 was a subsequent form completed by Ms. Wise in 2005, again stating she had herself observed numerous seizures, and describing them. Page 126 was completed by non-family member Amanda Gaines in 2005, reporting she had witnessed three seizures, and describing a typical seizure. Page 149 is a letter from Plaintiff's parents in 2006, stating their daughter had been on six different medications and none seemed to be working, as she was still having seizures. They stated they had to do many things for her, including picking up her daughter from school, driving

Plaintiff, and cooking for her and her family. They stated she missed a lot of her hair dressing appointments and lost a lot of clients at work. She had seizures at the beauty salon and was afraid to go to work. She was confused a lot and they had to keep reminding her of everyday things. She was also depressed and gaining a lot of weight, had sleep problems, was fatigued, and had major mood swings.

Pursuant to the remand, another non-family member (signature illegible) wrote that Plaintiff had seizures "very frequently" and he/she had witnessed two (R. 529). The individual again described in detail a typical seizure. Plaintiff's father completed a "Third Party ADL Form" stating that Plaintiff had been on seven different medications and none seemed to stop her seizures "and this seems like it effect [sic] other medical problems like depression and panic attacks" (R. 524). He stated she had trouble working, doing any work, and "was only able to do that because her clients will make new appointments."

Despite the Court's order expressly directing the ALJ to consider the third-party evidence, the ALJ discussed only one of Ms. Wise's reports, and none of the others. As to that one report, the ALJ found Ms. Wise's description of Plaintiff's "episodes" did not comport with Dr. Alghadban's related treatment history, and that he could not reconcile doctor reports and the other evidence of record with Ms. Wise's allegations. He therefore "believed" Ms. Wise's "allegations" tended "only to further diminish Plaintiff's credibility."

Contrary to Defendant's argument, the undersigned does not find that the ALJ "fully explained" why Ms. Wise's statement "fully contradicted" the remaining medical evidence of record. Neither the ALJ nor the Commissioner describes any evidence that contradicts Ms. Wise's report, and the undersigned could find none. All of Plaintiff's treating physicians candidly state that they have

never witnessed Plaintiff having an actual seizure. The EMS personnel description of her "postictal" symptoms does comport with Ms. Wise's description.

> As to the other 6 reports, the ALJ states only:

> The undersigned has fully considered all third-party evidence of record submitted by others and bearing upon the claimant's seizure activity and work-related abilities (Exhibit 5E, 8E, 14E, 21E and 26E). The Administrative Law Judge has accorded such evidence only such cumulative weight as would offer support for the limitations which have been incorporated within the residual functional capacity determination above.

(Emphasis added). In Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. See, e.g., Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). As we said in Arnold: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259.

Frankly, the undersigned is at a loss to determine what weight, if any, the ALJ actually accorded the third-party evidence. All of the reports are consistent with each other. Finally, and most significantly, Listing 11.00 expressly states that statements of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available. The undersigned interprets this to mean that it is not unusual for there to be a lack of observed seizures by physicians, and that evidence from third-parties is therefore essential to the evaluation of the claim.

For all the above reasons, the undersigned United States Magistrate Judge finds the ALJ's decision does not comply with this Court's previous remand order. Further, substantial evidence does

not support his credibility finding or Step Three findings.

## D. Severe Impairments

Plaintiff next argues that the ALJ erred because he failed to properly consider her severe impairments at Step Two of the sequential evaluation process. Defendant contends the ALJ correctly evaluated the severity of Plaintiff's impairments at Step Two. As already discussed, the ALJ found in his first decision that Plaintiff had the severe impairments of "seizure disorder; depressive disorder; and anxiety disorder" (R. 21). After the claim was remanded by this Court, however, he found, that Plaintiff had only a "history of seizures or pseudoseizures" (R. 336). Notably, in the section of the decision dealing with severe impairments, the ALJ discusses only Plaintiff's claim of lupus. The only analysis of the claim of seizures in that section is one sentence (out of a page and a half), in which the ALJ finds it "significant" that the reports of two doctors treating Plaintiff for lupus indicate their understanding that Plaintiff had a seizure condition being followed by neurologist Alghadban, "but those notes contain little indication that the claimant ever complained of or described any actual uncontrolled or other significant seizure activity at her visits with those physicians." Contrary to this statement, the undersigned does not find it "significant" that two physicians treating an individual for a skin condition would not include much, if any, discussion regarding seizures, an impairment being followed by a specialist in those impairments.

Additionally, in his Step Three findings, the ALJ states:

The undersigned does not believe that any fully credible and objective medical evidence of record indicates that the claimant has a valid seizure disorder or treatment regimen that "meets" or comports with [Social Security Ruling 87-6]'s requirements. Dr. Alghadban's statement in his letter of November 3, 2008, that the claimant has a "combination" of "seizures and pseudoseizures" appears to the undersigned as an effort to explain a still-puzzling condition and reported episodic seizure activity that has not been adequately explained or established by objective diagnostic medical testing or findings.

(R. 338). The ALJ then concludes that Dr. Alghadban's explanation of pseudoseizures removes Plaintiff's condition from serious evaluation under the listings and instead implicates a somatoform (psychological) disorder. The undersigned again notes that not one physician or psychologist (even the DDS reviewing physicians and psychologists) found Plaintiff did not have a seizure disorder. Nor did any diagnose her with a somatoform disorder instead. No physician ever even hinted that Plaintiff may be feigning a seizure disorder or malingering. Plaintiff's long-time treating neurologist, Dr. Alghadban, expressly stated his opinion that Plaintiff suffered currently from both seizures and pseudoseizures. All the witness testimony was consistent, and described current seizure activity.

The undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's Step Two determination that Plaintiff had only "a history of seizures or pseudoseizures."

### E. Credibility and Speculation

The undersigned finds Plaintiff's next two arguments actually both regard the ALJ's credibility determination. Plaintiff argues the ALJ erred because he based a significant portion of the decision on pure unsupported speculation, and because he failed to properly consider Ms. Rebrook's credibility. Defendant contends the ALJ did not speculate but correctly found Plaintiff not credible, and that his credibility analysis is proper. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain,

34

or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The undersigned must first note that he believes the ALJ's error at Step Two in not finding Plaintiff suffered from current seizures at all, is fatal to his credibility determination. If, as he found, Plaintiff had only a history of seizures and pseudoseizures, she could not pass Step One of the credibility evaluation. Worse, as he found at Step Three, he did not believe that any fully credible and objective medical evidence of record indicated that Plaintiff had a valid seizure disorder or treatment regimen that met or comported with the requirements of [SSR 87-6]. This statement appears to the undersigned inconsistent with a finding that Plaintiff has shown by objective evidence the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Id.

The ALJ does not, in fact, state that Plaintiff has medically determinable impairments that

could reasonably be expected to produce the actual pain, in the amount and degree alleged by the claimant. Instead, he finds that Plaintiff "has had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms she has alleged." This finding could mean almost anything. It could mean that she only had a history of skin rash or only a depressive disorder or only an anxiety disorder. It is therefore impossible for the undersigned to determine whether the ALJ found Plaintiff had met the threshold requirement of Craig.

Assuming, *arguendo*, the ALJ has found Plaintiff met the threshold step in Craig, he was next required to evaluate the intensity and persistence of the her symptoms, and the extent to which they affected her ability to work. This evaluation must take into account not only the claimant's statements, but also "all the available evidence," including her medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence, and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. Again, the undersigned notes the ALJ's failure to consider most of the third-party evidence– considered a requirement under the Regulations, and finds he has therefore not taken into account "all the available evidence." Further, again in his credibility analysis, the ALJ raises the issue of the lack of any abnormal EEG's, despite the fact that "it is rare for an EEG to confirm epilepsy in its other forms for either adults or children." See 67 F.R. 20018, *20019.

Regarding the evidence the ALJ has included in his credibility evaluation, Plaintiff in particular complains about the ALJ's statements regarding her use of anti-anxiety medications. From the record, it appears Plaintiff was prescribed first Ativan then Xanax by neurologist Alghadban, as well as other medications, as he was evaluating and treating her seizure disorder. Dr. Alghadban

stated his opinion that at least some, if not all her seizures may have been stress/panic related. In addition, Plaintiff was being treated by a licensed psychologist for depression and anxiety. Regarding Plaintiff's use of these prescribed medications, however, the ALJ states:

> The undersigned also believes that one may reasonably conclude that an individual who has demonstrated long-term reliance upon addictive medications is more likely than not to report such ongoing symptoms as will facilitate continued obtainment of such medications, even in the absence of actual symptoms of such debilitating severity as would warrant the need for such medications (or the increased dosages of such medications requested.) The Administrative Law Judge also believes that a medication-dependent individual is also unlikely to acknowledge or report such a decrease in the debilitating severity of symptoms as would result in the discontinuation of addictive medication (or a decreased dosage of such medications), even if such symptoms have actually subsided. In view of this Claimant's long term use of benzodiazepines absent any longitudinal history of formalized treatment for mental illness, such factors may reasonably be considered in evaluating the credibility of the claimant's complaints as to anxiety, panic and agoraphobia. (R. 345).
> . . . .
>
> Again, the undersigned believes that the claimant's long-term use of addictive benzodiazepines must be considered in evaluating her motivations, mental health treatment and ongoing complaints. (R. 346)
> . . . .
>
> Again, the claimant's reported stress and anxiety appear largely to the Administrative Law Judge as natural, predictable responses to various domestic, financial and social stressors, escalated within a context that involved multiple sources of contingent, secondary gain (e.g., ongoing addictive medications and impairment related benefits) (R. 346-347).

As already noted, Plaintiff was prescribed what the ALJ refers to as these "addictive medications (Alprazolam, Ativan, Lorazepam, or Xanax, each an addictive benzodiazepine tranquilizer, taken four times daily)" by her neurologist in the course of treating what he believed may have in part been

stress induced seizures. The undersigned finds the ALJ's naming of all four medications particularly misleading, since Xanax is simply the trade name of alprazolam and Ativan is simply the trade name for lorazepam. See Dorland's Illustrated Medical Dictionary (31ˢᵗ Ed.). Plaintiff was also under the long-term care of a treating psychiatrist (the "formalized treatment" the ALJ found was lacking), who diagnosed her with depression and anxiety. Significantly, no treating, examining, consulting, or even reviewing physician ever found Plaintiff was prescribed these anti-anxiety medications unnecessarily, that she did not need them, that she was addicted to them, that she was drug-seeking, that she was abusing medications, or that she was feigning or malingering her impairments for any reason.

A review of the second decision shows the ALJ relied almost entirely on Plaintiff's performing part-time work as a beautician for his opinion that she was not credible. As Defendant states, it is not improper for the ALJ to consider work history in making his determination. The ALJ himself notes, however, that Plaintiff's income ranged from only $1,367 to $1,971 per year in 2003 through 2007. He then states:

> However, the undersigned notes that the claimant's report annual self-employment earnings over a period of three years prior to 2003– when she was purportedly working "full-time"– were also less than $1500 in 2000, 2001 and 2002.

(R. 336). The ALJ later finds:

> [T]he claimant's demonstrated, ongoing ability to consistently perform even "part-time" work as a hair stylist over a sustained period of years tends to contraindicate any totally disabling agoraphobia, inability to be around other, panic, anxiety, depression or "pseudoseizures." Finally, a hair stylist would normally be expected to use scissors and possibly other sharp instruments, so the likelihood of one doing that exact job, even part-time, with a serious seizure disorder, seems small

(R. 340). The ALJ also noted that, although Plaintiff testified she worked for Creations Salon, there was no reported income from such a business.

Plaintiff testified at the first hearing that she worked one day a week, from one hour to three or four at a time. She was paid by the client, not the business, consistent with the lack of income from Creations Salon that troubled the ALJ. She testified she was sometimes unable to go in the one day per week, and then had to reschedule clients, testifying she had lost a lot of clientele because she had seizures at the salon. She testified that on one occasion, "[her] one customer had drove [sic] from Buckhannon [to Bridgeport] and had to turn around and, you know, drive back home because my parents had to come pick me up from work." This testimony is consistent with Plaintiff's parents' reports. Her testimony is also consistent with her reported income, which was around $5,000 to $6,000 dollars per year from 1988, until 1998 (R. 64), then dropped to $3,000 in 1999, the year she reported she had her first seizure, and then never above $2,000 any year after.

The undersigned agrees with Plaintiff that the ALJ's findings in this regard are not supported by substantial evidence. The undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's credibility determination.

### F. Medical Opinions

Finally, Plaintiff argues that the ALJ erred by failing to properly consider medical opinions that were favorable to her. Defendant contends the ALJ correctly considered all the medical opinion evidence of record.

First, Plaintiff argues that the ALJ did not state what weight, if any, he accorded long-time treating neurologist Alghadban's opinion. Second, the ALJ erred by rejecting that doctor's opinion as being based "largely, if not entirely" on Plaintiff's credibility. Defendant contends the ALJ

properly found Dr. Alghadban's opinion that Plaintiff had seizures was based solely on Plaintiff's subjective statements.

Plaintiff next argues that the ALJ outright rejected the opinion of longtime treating psychiatrist, McClure, based on Plaintiff's use of prescribed medication, her work activity, and "his own medical diagnoses finding Ms. Rebrook's 'stress' and 'anxiety' were nothing more than 'predictable responses to various domestic, financial and social stressors . . . .'" Defendant contends the ALJ properly rejected Dr. McClure's opinion because the limitations he identified were overstated and inconsistent with his contemporaneous treatment notes.

Finally, Plaintiff argues the ALJ failed to account for consultative psychologist Allman's finding on two separate occasions, that Plaintiff had severely deficient concentration. Defendant contends the ALJ gave significant weight to Ms. Allman's opinion that Plaintiff's mental impairments resulted in no more than mild limitations but for her ability to interact with the general public, and fully incorporated those findings into her residual functional capacity assessment. The ALJ also noted Ms. Allman's finding of severely deficient concentration, as measured by serial sevens, but found such a limitation inconsistent with Plaintiff's ability to work as a cosmetologist and not indicative of a totally disabling mental impairment.

20 C.F.R. § 404.1527(d) provides:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. <u>When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.</u>

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

41

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(Emphasis added).

There is no dispute that Dr. Alghadban is Plaintiff's treating neurologist. He treated Plaintiff for her seizure disorder and also referred her for testing. He has treated Plaintiff for a number of years. All these factors weight heavily in favor of according Dr. Alghadban great, if not controlling weight. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Further, SSR 96-2p provides:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

As Plaintiff contends, there is no specific weight accorded Dr. Alghadban's opinion. On the other hand, it is clear to the undersigned that the ALJ rejected his opinion. In his decision, the ALJ states:

> Thus, in the opinion of the Administrative Law Judge, Dr. Alghadban appears to base his diagnoses . . . . largely, if not entirely, upon his conviction as to the claimant's underlying credibility and upon the bases of her subjective presentation and longitudinal complaints. Whereas is it generally incumbent upon and in the best interests of any medical practitioner to act upon and treat an individuals'

42

subjective medical complaints at face value, without significant question or reservation, the Administrative Law Judge must necessarily evaluate a claimant's underlying credibility upon a review of all longitudinal evidence of record. Dr. Alghadban endorses both the claimant's credibility and the notion that she would be a "very unreliable employee" as a result of the "unpredictable nature of her impairments" . . . . The undersigned is not compelled to accept Dr. Alghadban's estimation of the claimant's credibility, which appears as the essential basis for his diagnoses and opinion as to her residual functionality.

. . . .

[T]he Administrative Law Judge does not find the claimant to be a fully credible or reliable informant, and believes that she has exaggerated the debilitating severity of her impairment-related limitations in order to facilitate her claims. Thus, the undersigned expressly declines to accept any medical opinions of record which have been predicated essentially upon the veracity of the claimant's subjective presentation and impairment-related complaints.

The ALJ does cite two particular reasons he rejected Dr. Alghadban's opinion, as follows:

The fact that Dr. Alghadban is ostensibly willing to accept without question the claimant's reported diagnosis of "lupus erythematosus" - - which is inadequately supported by any known objective findings and is in fact contrary to more reliable, treating medical opinion evidence - - tends to render that physician's objectivity suspect.

and

In that Dr. Alghadban appears to credit the claimant's seizure disorder essentially upon the bases of her subjective complaints, the Administrative Law Judge find it difficult to ascertain any objective basis upon which a physician could intermittently decide when the claimant should or should not be granted "permission" to drive. The claimant indicated . . . she still had a valid driver's license and drove only "when [her] doctor allow[ed] it . . . ." But the undersigned understands State law to require physicians to notify the State when a patient has epileptic seizures and driver's licenses are then cancelled, for at least a time.

As to the first reason, the undersigned notes that Plaintiff was diagnosed with and treated for lupus

43

erythematosus by a dermatologist. After this diagnosis, Dr. Alghadban noted the diagnosis, noted that Plaintiff's labs were not abnormal, and noted she was taking prednisone. Plaintiff was then referred to a rheumatologist who noted she had areas of extreme erythema over her face, neck, low back, gluteal regions, thighs and arms. The rheumatologist suggested Plaintiff might be suffering from a cutaneous lupus rather than systemic lupus, based on the negative lab results. He opined that Plaintiff had "a rather significant rash and polyarthralgia, which could include diagnoses of connective tissue disease." Subsequently, Dr. Alghadban noted Plaintiff's unremarkable workup and opined she may have "skin lupus" rather than systemic lupus. He noted she nevertheless was on a high doses of steroids causing cushionoid symptoms. About a month later, psychiatrist McClure noted Plaintiff's blotchy skin. Soon afterward the rheumatologist opined he doubted the rash was due to lupus, but if it was, it was the cutaneous and not systemic type. Approximately a year after being diagnosed with lupus, rheumatologist Kafka opined that Plaintiff might have a connective tissue disorder or "lupus limited to the skin," but "doubted" she had systemic lupus. In August 2008, treating physician Keesee wrote that Plaintiff had "a Lupus like illness that leads to period of increased musculoskeletal pain . . . ."

The Lupus Foundation of America notes there are several forms of lupus, including systemic lupus erythematosus and cutaneous lupus erythematosus, and states:

> [T]here are many challenges in confirming that a person has lupus and not some other disease. Lupus is known as "the great imitator" because its symptoms mimic many other illnesses. Also, lupus symptoms can be unclear, can come and go, and can change . . . . [L]aboratory tests alone cannot give a definite "yes" or no" answer.
> . . .
>
> •    No single laboratory test can determined whether a person has lupus.
> •    Test results that suggest lupus can be due to other illnesses, or

can even be seen in healthy people.
- A test result may be positive one time and negative another time.
- Different laboratories may produce different test results.[2]

The undersigned finds substantial evidence does not support the ALJ's determination that Dr. Alghadban accepted "without question" Plaintiff's diagnosis of lupus erythematosus. He clearly did question that diagnosis, and did not rely only on Plaintiff's own report; however, even the specialists had difficulty diagnosing Plaintiff's severe skin symptoms and joint pain and none totally ruled out lupus erythematosus. Several specialists "doubted" she had the systemic form but believed she may have the cutaneous form– even years after she was fist diagnosed.  In February 2008, specialist Dr. Kafka still opined that Plaintiff might have an undifferentiated connective tissue disease, which as noted earlier is strikingly similar to systemic lupus, and may, in fact, go on to become systemic lupus.  The symptoms of skin rash and arthritis and arthralgias are the same in both cases, and the disease is  considered "undifferentiated" instead of "systemic lupus" generally only due to the lack of positive lab results.  The undersigned therefore finds Dr. Alghadban's statements that Plaintiff had lupus erythematosus is not "persuasive contradictory evidence" to rebut his opinion.

Further, neither the ALJ nor the Defendant cites the West Virginia law that "requires physicians to notify the State when a patient has epileptic seizures," and the undersigned did not find such a law in West Virginia.   According to Epilepsy.com, although all 50 states restrict driver's licenses for persons with active seizures not controlled by medication, only six (California, Delaware, Nevada, New Jersey, Oregon and Pennsylvania) require physicians to report patients who

_____

[2]http://www.lupus.org/webmodules/webarticlesnet/templates/new_learndiagnosing.aspx?articleid=2240&zoneid=524

have seizures to the state.[3]   Therefore, whether or not Plaintiff should have been permitted to drive, the ALJ's statement that "the undersigned understands State law to require physicians to notify the State when a patient has epileptic seizures and driver's licenses are then cancelled, for at least a time" is not supported by substantial evidence, and his resultant finding that Dr. Alghadban's failure to notify the state undermined his opinion that Plaintiff had seizures is also not supported by substantial evidence.

The undersigned finds the remainder of the reasons the ALJ provided for rejecting Dr. Alghadban's opinion are not "persuasive contradictory evidence." He based his rejection almost totally on his finding that the treating neurologist relied only on Plaintiff's subjective reports, which he found not credible. The undersigned has already found that substantial evidence does not support the ALJ's credibility finding, and this argument must therefore also fail. The undersigned finds the ALJ also did not comply with SSR 96-2p or 20 C.F.R. § 404.1527(d) regarding treating physician opinions.

The undersigned therefore finds substantial evidence does not support the ALJ's rejection of Dr. Alghadban's opinion.

There is also no dispute that Dr. McClure is Plaintiff's treating psychiatrist. The length of the treatment relationship and the nature and extent of the treatment relationship each weigh heavily in favor of that doctor's being accorded great, if not controlling weight. The ALJ here totally rejected Dr. McClure's opinion, however.   The ALJ explains his outright rejection of Dr. McClure's opinion as follows:

He wrote that the claimant despite treatment had "poor concentration,

---

[3]http://www.epilepsy.com/epilepsy/rights_driving

46

poor energy, emotional lability, and agoraphobia," which he hypothesized would prevent her from "seeking out or reliability [sic] maintaining gainful employment in the community for the next 18-24 months . . . . It is clear that Dr. McClure does or would endorse the claimant's candidacy for disability benefits but the undersigned does not find that practitioner's opinion to be reliable or controlling. Dr. McClure asserts that the claimant's symptoms persisted "despite compliance with treatment," i.e., that she had essentially untreatable or intractable symptoms. Yet, he speculates in effect that she might somehow become "employable" again in 18-24 months. Dr. McClure's projection that the claimant's anxiety and depression will not respond for "18-24 months" appears entirely arbitrary and calculated to support her contingent interests. Dr. McClure does not question the claimant's motivations or endeavor explain [sic] how she is able to consistently perform part-time work week after week – work that requires her to interact with others - - but would be unable to engage in full-time work activity. Again, the claimant's employment record is suspect and reveals little change in her customary work pattern as her complaints have escalated. No convincing and objective longitudinal medical findings indicate to the Administrate Law Judge that she has any impairments that would persistently preclude her ability to do so. It is instructive that Dr. McClure's notes of March 29, 2006, indicate that the Claimant had been doing "well" until that day "when she learned that her gas was being or had been turned off." She indicated that she was "stressed" by her "legal problems." However, she was noted to be "chatty," "calm" and sleeping well . . . Again, the undersigned believes that the claimant's long-term use of addictive benzodiazepines must be considered in evaluating her motivations, mental health treatment and ongoing complaints.

Also:


The claimant stated in June 2008 that she was "not doing well because her father had passed away two weeks earlier." However, she indicated that her benzodiazepine medication (Xanax) was "helpful" . . . . Again, the claimant's reported stress and anxiety appear largely to the Administrative Law Judge as natural, predictable responses to various domestic, financial and social stressors, escalated within a context that involves multiple sources of contingent, secondary gain (e.g., ongoing addictive medications and impairment-related benefits).


The undersigned does not find the ALJ has cited "persuasive contradictory evidence" to rebut

the treating psychiatrist's opinion, and finds substantial evidence does not support the outright rejection of Dr. McClure's opinion.

Finally, Plaintiff argues the ALJ failed to account for consultative psychologist Allman's finding on two separate occasions, that Plaintiff had severely deficient concentration.[4] As a consultative, "examining" psychologist, Allman's opinion was entitled to lesser weight than a treating physician's but more weight than a non-examining physician's; regardless of the weight given, the ALJ is still required to consider the factors in 20 C.F.R. § 404.1527, and explain the weight given according to SSR 96-2p. Regarding that opinion, the ALJ states:

> It is of note that, at consultative psychological evaluations in October 2005 and May 2008, the claimant was indicated to have "severely" deficient concentration, but only as measured by her ability to do "serial sevens" At both evaluations she demonstrated normal interactions with the evaluating psychologist and her persistence and pace were adjudged to be "within normal limits."

The ALJ went on to state that Ms. Allman concluded that Plaintiff had more than mild psychological impairment-related limitations only with regard to her ability to interact appropriately with the public. The ALJ then stated that he gave her opinion significant weight. The ALJ does not ever indicate the weight he gave Ms. Allman's opinion, stated in the body of each evaluation, that Plaintiff's concentration was severely deficient and that her prognosis was poor. The undersigned notes that treating psychologist McClure also found Plaintiff had severe concentration problems. The undersigned finds substantial evidence does not support the ALJ's finding concerning Ms. Allman's opinion regarding Plaintiff's concentration.

---

[4] Allman performed these evaluations at the request of the State agency.

# V. CONCLUSION

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's finding that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time during the period at issue, i.e., from her alleged onset date of August 2003, through December 30, 2008, the date of his Decision.

The undersigned notes that Plaintiff filed her original application for benefits on August 30, 2004, nearly 6 years ago. The Appeals Council denied her Request for Review in January 2007, and Plaintiff's first Complaint was filed with the Court on March 12, 2007. This Court found that substantial evidence did not support the Commissioner's decision because the ALJ applied the outdated listings, requiring a positive EEG. The undersigned finds despite the Court's express order, the Commissioner again used the lack of a positive EEG as a basis for denial of benefits. The Court in the first decision found the Commissioner improperly rejected Dr. McClure's, Dr. Alghadban's, and Ms. Allman's opinions. The undersigned finds the Commissioner continued to improperly reject the three treating physicians' opinions. The Court ordered the Commissioner on remand to consider the third-party witness statements, even providing exact page numbers for reference; nevertheless the Commissioner did not even address most of those statements.

Most significantly, the Court in the first decision relied on the ALJ's finding that Plaintiff had a severe impairment of seizure disorder, and acknowledged a number of times in its Order that Plaintiff had a seizure disorder and suffered from seizures. The Court explicitly found the ALJ's RFC and hypothetical to the VE "did not sufficiently account for Claimant's limitations arising from her seizures." (Report and Recommendation at 38). Defendant did not object to any finding of fact or conclusion of law in the Report and Recommendation and did not appeal the Court's Order which

adopted the Report and Recommendation. In the second decision, however, the ALJ determined

Plaintiff did not have a "valid" seizure disorder at all.

It is a rare situation in which the undersigned recommends a claim be reversed and remanded

solely for a calculation and award of benefits, but the undersigned finds the Commissioner had no

basis for denying Plaintiff had a seizure disorder. In <u>Breeden v. Weinberger</u>, 493 F.2d 1002 (4th Cir.

1974), the Fourth Circuit concluded that the administrative decision denying coverage in that case

was not supported by substantial evidence, and held:

> Ordinarily we would remand to give the Secretary an opportunity to apply the correct legal standard. This case, however, has been pending in the agency and the court for almost five years and has been remanded once before for additional evidence. The statute governing review in Social Security cases authorizes us to reverse the Secretary's decision "with or without remanding the cause for a rehearing." 42 USC section 405(g). We have previously exercised this discretion . . . . Under this statute, we think it appropriate to reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose . . . . Because both circumstances are present in this case, we will not delay the case . . . . Instead we remand to the district judge, who should enter judgment for the claimant and direct the Secretary to pay her such benefits, if any to which she may be entitled under the law and the regulations.

(Id. at 1011-1012)(internal citations omitted).

Under this Fourth Circuit precedent reversal without remand for rehearing or additional

evidence is therefore appropriate where: 1) the record does not contain substantial evidence to

support a decision denying coverage under the correct legal standard; and 2) reopening the record

for more evidence would serve no purpose. The undersigned finds that the ALJ's decision was not

supported by substantial evidence. The ALJ twice failed to properly consider the opinions of

claimant's treating physicians; twice failed to consider the third-party witnesses; twice failed to

properly evaluate Plaintiff's credibility; and most importantly, found she had no severe seizure

impairment despite every piece of evidence, including the first decision and Court Order indicating she had. The undersigned therefore finds substantial evidence on the record as a whole indicates that the Claimant was disabled. Further, reopening the record would serve no purpose in this case—there are no inconsistencies and further development is not required regarding Plaintiff's claim. See Jones v. Astrue, — F. Supp. 2d —, 2010 WL 1346466 (March 2010 D.S.C.)

The undersigned therefore RECOMMENDS the Commissioner's denial of benefits be REVERSED, and the matter REMANDED to the Commissioner for an award of benefits, if any, to which she may be entitled under the law and regulations.


## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 17] be **DENIED,** and Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED** by reversing and remanding this case to the Commissioner solely for the calculation and award of benefits.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 14th day of May, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE